# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2407 | **DATE** | December 21, 2000 |
| **CASE TITLE** | IN RE: Mexico Money Transfer Litigation | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Petition for final approval of settlement is granted.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | 13 number of notices | Document Number |
| x | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | DEC 22 2000 date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 12/21/00 date mailed notice | |
| ETV | courtroom deputy's initials | SD-7 FILED FOR DOCKETING 00 DEC 21 PM 6: 59 | | ETV mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE MEXICO MONEY TRANSFER    )
LITIGATION (WESTERN UNION AND    )
ORLANDI VALUTA)    )
    )    Nos.  98 C 2407
————————————————————————)              98 C 2408
    )
IN RE MEXICO MONEY TRANSFER    )
LITIGATION (MONEYGRAM)    )    Judge Rebecca R. Pallmeyer

DOCKETED
DEC 2 2 2000

## MEMORANDUM OPINION AND ORDER

In addition to the fee they charge for wire transfers of funds to Mexico, Defendants in these nationwide class actions collect the difference between the foreign exchange rate they charge their customers and the more favorable rate that Defendants themselves pay for pesos. In these consolidated actions, and a number of cases in other jurisdictions, Plaintiffs challenge Defendants' failure to disclose the exchange rate mark-up to their customers. After months of discovery and negotiation, the parties reached settlements. They now seek this court's final approval of their agreements, under which Plaintiffs' claims are released in return for discount coupons, an injunction, a *cy pres* fund, and attorneys' fees and costs.

This court had concerns about the wisdom and fairness of the coupon-based settlement proposed by the parties. In response to its own concerns and to objections voiced by individual class members and intervenors represented by counsel, the court conducted an unusually lengthy evidentiary hearing on December 10, 1999, January 18-20, 2000, and August 11, 2000. In addition to the evidence presented at that hearing, the court considered all parties' submissions, affidavits, and expert opinions on the fairness, reasonableness, and

adequacy of the settlements. Several class members have objected to the terms of the settlements. The most significant objections were voiced by a group of California residents ("California Objectors" or "Intervenors") who argue that the availability of claims under California law renders the proposed settlements inadequate with respect to California residents. Having considered the record in its entirety, and giving appropriate consideration to the concerns expressed by the Intervenors, the court now grants approval of the proposed settlements, as explained in the findings and conclusions set forth herein.

## FACTS

The facts generating these lawsuits are essentially undisputed. Defendants are engaged in the business of providing electronic fund transfers on behalf of clients seeking to transmit money to various locations in Mexico. Defendants include Western Union Financial Services, Inc., Orlandi Valuta, Orlandi Valuta Nacional, First Data Corporation (98 C 2407) and Integrated Payment Systems, Inc. (98 C 2408). As compensation for these services, Defendants charge their customers a transaction fee or service charge. In addition, Defendants recover revenue on the exchange rate. Although they receive dollars from their customers and provide pesos to the recipients at a disclosed rate, Defendants are able to purchase pesos themselves at a more favorable exchange rate. The difference between the exchange rate they make available to their customers and the exchange rate at which they purchase pesos (referred to here sometimes as "FX [foreign exchange] spread") provides Defendants with substantial additional compensation ("FX revenue"). Plaintiffs brought these lawsuits under a variety of theories to challenge Defendants' practice of recovering this

additional compensation without disclosing it.

At the time of each transaction, Defendants' customers are given a receipt that discloses the service charge, the exchange rate being offered by the Defendants, and the number of pesos that will be paid in Mexico to the designated recipient. Defendants, who purchase pesos in the "interbank" (or wholesale) market in blocks of $5 million, pay an interbank exchange rate for those pesos. There is no "official" set rate for exchange in this market; instead, the rate is determined by market forces and fluctuates rapidly. Similarly, there is no official exchange rate in the retail market for pesos. For example, a survey performed by Jim Dibe, an international currency market expert, demonstrated that on a date when the interbank market rate for pesos was approximately 9.345 pesos to the dollar, 34 retail companies were selling pesos at prices that ranged from 7.93 pesos to the dollar to as many as 9.30 pesos to the dollar. (Declaration of Jim Dibe, at ¶ 30.) On average, however, the difference between the retail exchange rate and the more favorable wholesale rate has been approximately 10%. (Plaintiffs' Consolidated Memorandum in Support of the Proposed Settlement of Each of the Nationwide Mexico Money Transfer Class Actions ("Plaintiffs' Memo"), at 4.)

In these cases, Plaintiffs alleged that Defendants' failure to disclose the existence of the FX spread to their customers is fraudulent and that the fraud is exacerbated by misleading advertising in which Defendants emphasize the transaction fee in a way that suggests this is the only revenue they receive for each exchange, for example, "Send up to $300 to Mexico for only $15." In fact, according to Plaintiffs, customers are paying not "only $15," but rather

3

$15 plus the amount of the FX spread. (98 C 2407 First Amended Complaint ¶¶ 20-24.) Plaintiffs allege violations of the federal RICO statute, breach of contract, fraud through misrepresentation, fraud through omission, conversion, breach of fiduciary duty, discrimination, and accounting/restitution. The complaints seek compensatory and statutory damages and penalties, prejudgment interest, attorneys' fees and costs and an injunction barring Defendants from collecting any FX revenue without disclosure of such revenue in all advertising.

**Litigation History**

Seven lawsuits challenging Defendants' practices are pending. Attorney Fred Kumetz filed two class action complaints on November 3, 1997 in federal court in Los Angeles: *Garcia v. Western Union Financial Services, Inc.,* Case No. 97-8118 RSWL (Rcx) and *Bueno v. MoneyGram Payment Systems, Inc.,* Case No. 97-8117 RSWL (Rcx). These lawsuits claimed violation of federal RICO and civil rights laws, among other claims, on behalf of a class of California customers. On August 4, 1998, the court granted a motion to dismiss the federal claims in these actions as inadequately pleaded, but granted leave to amend. Plaintiffs Garcia and Bueno chose not to do so, however, and instead filed complaints in state court alleging only California state law claims. *Garcia v. Western Union Fin. Servs., Inc.,* Los Angeles County Superior Court Case No. BC 197489 and *Bueno v. MoneyGram Payment Sys., Inc.,* Case No. BC 197490. Defendants' demurrers to these complaints were filed in November 1998.

Several additional lawsuits were filed, including the two pending before this court,

originally entitled *Pelayo v. Western Union Fin. Servs., Inc.*, No. 98 C 2407 and *Ross-Pineda v. MoneyGram Payment Sys., Inc.*, No. 98 C 2408; two in Texas (*Sandoval v. Western Union Financial Servs., Inc.*, Case No. 20240 and *Fernandez v. MoneyGram Payment Systems, Inc. et al.*, Case No. M-99-005), both on behalf of state-wide classes; and another case in federal court in California, this one on behalf of a nationwide class, *Ibarra v. Orlandi Valuta, et al.*, Case No. SA CV-98-1011 GLT (C. D. Cal.). Yet another case was filed in Texas on behalf of a statewide class but voluntarily dismissed on January 6, 1999. *Villalobos v. Western Union Fin. Servs., Inc., et al.*, Case No. C-5353-98-E. On March 1, 1999, Defendants in the *Ibarra* case moved to dismiss, and on May 1, 1999 the federal court granted that motion in part, concluding that the RICO claims were insufficient and allowing leave to amend that complaint.

The two lawsuits before this court were initially assigned to Judge Ann C. Williams. At her direction, attorneys in these two cases and in the two Texas actions (hereinafter collectively "National Class Counsel") initiated settlement negotiations which lasted nearly a year and resulted in preliminary agreements which were presented to the court in 1999. Judge Williams suggested, and the parties agreed to, an enhancement to their proposed notice to class members, directing that Defendants post notices at their local agent offices. Defendants and National Class Counsel executed nationwide settlement agreements in May 1999.

National Class Counsel consists of well-respected plaintiffs' attorneys from eight law firms in Illinois (Matthew Piers of Gessler, Hughes & Socol, Ltd. and Robert Graham of

Jenner & Block) and Texas (Steve McConnico of Scott, Douglas & McConnico; Nelson Roach of Nix, Patterson & Roach; Timothy Crowley of Crowley & Douglas, LLP; and Craig Sico of Harris & Watts). Attorneys for the proposed class in the *Ibarra* action in California also agreed to the terms of the proposed settlement, as did Mr. Kumetz initially. In May 1999, National Class Counsel filed amended complaints and the parties filed joint motions for class certification and preliminary approval of their settlement. On May 12, 1999, Judge Williams entered a Preliminary Settlement Order in each of these cases in which she certified a nationwide class, granted preliminary approval to the settlement, and entered an anti-suit injunction which barred further prosecution of any claims that would be discharged in the settlement. On July 16, 1999, the court approved an amended class definition, approved the proposed notice provisions under Rule 23 and due process standards, established opt-out procedures, directed the parties to proceed with notice, and set a fairness hearing for December 10, 1999. The nationwide classes certified in the July 16 order consist of (1) all persons who used the Western Union and/or Orlandi Valuta electronic money transfer service to wire money from anywhere in the United States to the Republic of Mexico between January 1, 1987 and August 31, 1999 ("*Pelayo* settlement class") and (2) all persons who used the electronic money transfer service operated under the name MoneyGram to wire money from anywhere in the United States to the Republic of Mexico between January 1, 1988 and August 31, 1999 ("*Ross-Pineda* settlement class").

The California plaintiffs represented by Mr. Kumetz, Raul Garcia and Lydia Bueno, moved to intervene in these cases and to vacate the injunction against other litigation. Judge

Williams granted leave to intervene on July 29, 1999. On October 13, 1999, she denied the motion to vacate the anti-suit injunction. On November 24, 1999, Judge Williams ordered the parties to the settlement and the objecting Intervenors to submit declarations in advance of the fairness hearing, setting forth the testimony of any witnesses they expected to call. Nationwide Class Counsel, Defendants, and the Intervenors did submit numerous declarations. In addition, on January 11, 2000, attorneys for the Intervenors filed two new class actions in California state court, *Amorsolo v. Western Union Fin. Servs., Inc.*, Case No. BC 222974 and *Amorsolo v. MoneyGram Payment Sys., Inc.*, Case No. BC 222973; because class members consist of persons who opted out of the classes in this case and persons who used Defendants' services after August 31, 1999, these lawsuits do not violate Judge Williams' injunction.

On January 12, 2000, National Class Counsel and Defendants amended the settlement of this case, enhancing the benefit to class members by narrowing the scope of the releases and doubling the size of a proposed *cy pres* fund. Upon Judge Williams' elevation to her sea on the Court of Appeals, these cases were reassigned to this court. On May 22, 2000, th court granted the parties' motion for leave to provide appropriate notice of this amendme to persons who had opted out of the class and to certify newly identified class member

This court has reviewed the terms of the proposed settlements in detail. In add to provide ample opportunity for presentation of objections and evaluation of the pr settlement terms, the court conducted several days of evidentiary hearings in Decem! January 2000, and August 2000. The evidence supports the conclusions set forth

## DISCUSSION

### A.  The Negotiation Process

National Class Counsel and Defendants' attorneys submitted declarations describing the history of the settlement negotiations in this case, which consumed nearly a year. National Class Counsel initially demanded that Western Union provide the class with the choice of cash equal to Defendant's FX revenue of $388 million, plus interest (essentially, a full relief recovery) or coupons valued at three times that amount.  Plaintiffs demanded, further, that Western Union modify its practices regarding collection of FX revenue, provide a toll-free number at which customers could obtain current rates, and make a contribution to Mexican-American charitable causes in an amount equal to the unclaimed cash available to class members.  Western Union's initial counteroffer was for a $2.75 million cash settlement agreement and $22 million in coupons.

After further negotiations, National Class Counsel agreed to consider a coupon-only settlement agreement, if Defendants agreed that coupons would be fully transferable and could be used in connection with any other discounts or promotions.  In addition, Plaintiffs insisted that the claims procedure be simple and non-cumbersome.  Defendants initially resisted these demands, but after protracted negotiations the parties reached an agreement in March 1999.  Under the proposed resolution, the parties agreed to terms under which class members would receive two coupons worth $4.25 each for (1) each money transfer between November 3, 1993 and the end of the class period and (2) each 10 transfers from the beginning of the class period through November 2, 1993, in addition to equitable relief and a *cy pres*

fund.

Only after this agreement was reached was there any negotiation concerning attorneys' fees for National Class Counsel. National Class Counsel began with a demand of $30 million; Defendants' initial offer was $1 million. The parties ultimately agreed that National Class Counsel would seek an award of $9 million in the *Pelayo* case and $1,428,571 plus expenses in the *Ross-Pineda* case.

Fred Kumetz, who filed the *Garcia* and *Bueno* actions in California and who now represents five objectors to the proposed settlement here, participated in the settlement discussions. Although Mr. Kumetz declined Defendants' April 1999 invitation to Defendants participate in the negotiations with National Class Counsel, he did exchange proposals with Richard Grad, the attorney for Western Union. Western Union offered an all-coupon settlement and *cy pres* fund to resolve the *Garcia* case. Mr. Kumetz agreed to such terms but demanded an increase in the size of the *cy pres* fund and an increase from $4.25 to $7.00 of the face value of the coupons. Late in April, Western Union's attorney advised Mr. Kumetz that the agreement with National Class Counsel in the cases before this court provided for a nationwide settlement including two $4.25 coupons for each money transfer, a $2 million *cy pres* fund, an agreement to make certain disclosures in advertising, and an agreement to provide notice to class members via direct mail, print, radio and television advertising, and posting at agent locations. Mr. Kumetz asked that the terms of the nationwide settlements be amended to give class members one $6 coupon rather than two $4.25 coupons. National Class Counsel initially resisted this proposal, but ultimately agreed with Defendants and with

9

Mr. Kumetz to an arrangement in which class members are given the option of choosing a $6 coupon or two $4.25 coupons. Believing that he had signed on to the nationwide settlement, Defendants' counsel then began a discussion of attorneys' fees with Mr. Kumetz. Only a few days later, however, in May 5, 1999, Mr. Kumetz advised the parties in these cases that he had changed his mind and would be objecting to the proposed agreements. Mr. Kumetz explained to Mr. Grad that he had changed his mind because he believed that National Class Counsel were critical of him.

## B. The Terms of the Settlements

The settlements provide for distribution of discount coupons to class members; a *cy pres* fund; an injunction requiring disclosure of the FX revenue; and an award of atotnreys fees and costs. The specific terms are as follows:

1. **Coupons:** Each class member is entitled to receive coupons for discounts on future transfers of funds to Mexico. The coupons have an estimated aggregate face value of $270 million in the *Pelayo* action and $105 million in the *Ross-Pineda* action. Class members will have the option to choose either one $6.00 coupon or two $4.25 coupons for (1) every transaction from November 3, 1993 through August 31, 1999 and (2) for every ten transactions from the beginning of the class period (January 1, 1987 for *Pelayo* and January 1, 1998 in *Ross-Pineda*) through November 2, 1993. The parties agreed to less favorable terms for earlier transactions due to the Defendants' strong statute of limitations defenses to claims arising from those earlier transactions, but for any such transactions, the parties have agreed to round up to ten (for example, 1 of the earlier transactions will be deemed 10, and 11 will

be rounded up to 20). The size of the average FX spread on the challenged transactions was approximately $25. Thus, the two $4.25 coupons or one $6.00 coupon represent a recovery at face value of between approximately 24% and 34% of the FX spread on an average transaction. The coupons will provide for discounts of up to 50% of the service charge on future fund transfers. The coupons are freely transferable, redeemable in connection with any other discount, sale or promotion, and valid for 35 months.

2. *Cy Pres* **fund:** Defendants have agreed to a *cy pres* contribution in the amount of $4,000,000 in *Pelayo* and $634,920 in *Ross-Pineda* to be distributed to charitable or public interest organizations that serve Mexican or Mexican-American causes. Each fund will be administered by a committee which will include Antonia Hernandez, the President and General Counsel of the Mexican-American Legal Defense and Education Fund ("MALDEF"); Arturo Vargas, the Executive Director of the National Association of Latino Elected and Appointed Officials ("NALEO"); Matthew Piers, lead counsel for the Plaintiffs in this case; and a representative of the Defendant(s) in each case.

3. **Injunctive Relief:** Defendants have agreed to entry of an injunction requiring: (1) that they disclose on customer receipts the fact that they recover revenue on the difference between the foreign exchange rate they charge customers and the foreign exchange rate that Defendants pay for pesos; (2) that their price-related advertising will disclose not only the service charge but the FX rate set for each transaction; and (3) that they will establish a toll-free number at which customers can obtain current FX rates. This injunction will be in effect for 60 months but may be extended at the request of National Class Counsel for good cause.

4. **Attorneys' Fees and Costs:** National Class Counsel will seek an award of $9,000,000 in *Pelayo* and $1,428,571 in *Ross-Pineda*. Defendants will pay reasonable costs, subject to court approval.

5. **Notice and Administration:** Defendants will pay the costs of extensive notice and will administer the settlement, a benefit the parties value at more than $16 million.

6. **Release and Anti-Suit Injunction:** In return, Plaintiffs agree to a release of claims asserted in these actions and the other five pending actions, including any and all claims challenging the exchange rate, any and all claims relating to disclosures or non-disclosures concerning the exchange rate or the FX spread or FX revenue, and any and all claims that the recovery of FX revenue is unlawful for any reason. The court will issue an injunction barring any suit asserting these released claims.

## C. Class Notice

Judge Williams approved a procedure under which notice of the settlement was provided to nearly 13.5 million unique names and addresses in the Defendants' computer records via first class mail. Defendant Western Union discovered in January 2000 that, due to a computer error, approximately 177,000 customers had been excluded from the records used to generate the initial mailing list; this court therefore ordered first-class mail notice to these additional class members.

Because transaction records did not extend as far back as 1987, and due to the concern that the addresses might be inaccurate, notice was also made through the electronic and print media. Print notice of the settlements appeared in 27 major English-language newspapers and

27 Spanish-language papers in nine states (California, Texas, New York, Florida, Illinois, Arizona, Georgia, North Carolina and Colorado); in 34 newspapers in Mexico, and twice in *USA Today*. A 30-second television announcement was broadcast in Spanish on the Univision television network eight times per week for two weeks and on 16 Spanish-language local television stations in the states of California, Texas, New York, Florida, Illinois, Arizona, and Colorado nine times per week for two weeks. The announcement was broadcast on four TV stations in Mexico. Further, the parties broadcast the announcement over 115 Spanish-language radio stations in the nine states in which the newspaper announcements appeared. This 60-second radio announcement ran 24 times per week for two weeks and was broadcast on 102 stations in Mexico, 25 times per week for two weeks. Finally, in addition to the direct mail and electronic media notice, Defendant prepared and distributed a print notice for posting by their domestic agents across all 50 states and established a toll-free number for class members seeking information about the settlements.

After the notice had been disseminated, the settlements were enhanced as described above. At the parties' request, the court therefore directed that notice of the amendments be provided by first class mail to all class members who had opted out.

The court concludes this notice program, and the form of the notice itself, was complete and adequate to convey all relevant information to class members and afforded adequate opportunity to opt out or object. The notice included a description of the litigation and of the settlements, the right of class members to object or to opt out, notice of the time and place of the fairness hearing, and an explanation of the binding nature of the settlements.

13

The notices were written in language as simple and plain as possible under the circumstances and were provided in Spanish and English. In addition to the announcements generated by the parties, the settlements have been the subject of substantial news media coverage. The court concludes that notice to the settlement class in this case satisfies the requirements of Rule 23 and due process.

## D. Class Certification

Under Rule 23(a), a class may, be certified where "the class is so numerous that joinder of all members is impracticable (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). Judge Williams certified the settlement class at issue here in May 1999. As described below, the record supports her determination.

1.    **Numerosity:** In each of these actions, the class definition includes "all persons who have used [one of Defendants' money transfer services] to transmit money from anywhere in the United States to anywhere in the Republic of Mexico" over a defined period of years. It is not possible to count the exact number of class members, but based on information regarding the volume and frequency of transactions, there are two to five million individuals nationwide who are members of the classes, with at least a million members in each of the two settlement classes. Joinder of millions of class members is plainly impracticable.

2.    **Commonality:** This requirement is readily met in most cases. *See generally*

14

*Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992); 1 Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 3.10, at 3-50 (3d ed. 1992). Because Defendants do business in much the same way at locations nationwide, a number of issues are common to the class members: whether Defendants misrepresented the price class members paid for sending money to Mexico; whether Defendants acted with fraudulent intent; whether Defendants' relationships with their agents in the United States and Mexico constitute "associated in fact enterprises" for purposes of RICO; whether Defendants breached the terms of their standardized contracts with customers by purchasing pesos at one exchange rate and then selling them, in effect, to customers at a higher, less favorable rate; and whether Defendants have an obligation to disclose the existence and amount of the FX spread to their customers.

3.     **Typicality:** Class members claims need not be identical, as long as they are substantially similar. *Binion v. Metropolitan Pier & Exposition Auth.*, 163 F.R.D. 517, 524-25 (N. D. Ill. 1995). The typicality test is met if named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotations omitted). Here, all class members' claims arise from Defendants' practice of giving class members a lower exchange rate for their dollars than Defendants themselves receive when they trade dollars for pesos in the wholesale or interbank market. Every class member, in each of the lawsuits filed, has asserted similar theories: that Defendants' FX practices constitute a fraudulent scheme carried out through

a pattern of racketeering, conversion, breaches of fiduciary duty, and breaches of contract. Defendants' defenses to the claims of the named Plaintiffs are also identical to their defenses to the claims of all class members.

4. **Adequacy of Representation:** The purpose for examining the adequacy of class representation is to expose incompetent or ineffective class counsel and uncover any potential conflicts of interest between the class representatives and the remaining class members. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-27 (1997). There can be no genuine dispute concerning the competence or effectiveness of the attorneys who have represented these classes. National Class Counsel are experienced litigators who have vigorously prosecuted these cases. Nor does the court perceive conflicts between the named representatives and the other class members; as discussed more fully below, the court has concluded that California residents have no different claims, nor any stronger claims for relief, than do other members of the settlement classes. Representation is adequate here.

5. **Predominance of Common Questions, Superiority of Class Action:** For a class certified under Rule 23(b)(3), the court must find that common questions predominate over questions affecting individual class members and that a class action is superior to other available methods of adjudicating class members' claims. Those requirements are met here because all class members share a common grievance: all received fewer pesos in exchange for dollars than the number of pesos that Defendants were able to purchase for those dollars; and, all paid a transaction fee or service fee under circumstances that could have led them to believe this fee was the only compensation that Defendants received for their money

exchange services. Although individual issues relating to reliance, causation, and damages exist, they do not predominate and do not preclude class certification. As discussed more fully below, the court concludes that to the extent California class members may press other claims, these claims are not superior to the common claims set forth in the complaints in these cases, including claims under RICO.

Further, because individual compensation claims average approximately $25 per transaction, the court concludes that individual claims would allow for a far less efficient and fair resolution of the class members' claims. Nor do the manageability issues that might arise if this case were to be litigated preclude certification of a class for purposes of settlement.

## E.  Fairness and Adequacy of Settlement

Courts favor the resolution of a class action by way of settlement and will approve such a settlement if it is fair, reasonable, and adequate when viewed in its entirety. *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). In evaluating a proposed settlement, the court recognizes that the "essence of settlement is compromise" and will not represent a total win for either side. *Id.* at 1200, quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980). Accordingly, the court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985). In assessing the fairness, reasonableness and adequacy of a class settlement, the court must

balance six factors:

(a) the strength of plaintiffs' case, weighed against the settlement offer;

(b) the complexity, length, and expense of further litigation;

(c) the presence of collusion between the parties;

(d) the opinion of competent counsel;

(e) the reaction of class members to the proposal; and

(f) the stage of proceedings and discovery completed.

See *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985). The court addresses these factors below.

1. **Strength of case balanced against the offer:** As noted, Plaintiffs' complaints assert eight causes of action, including claims of violation of RICO, breach of contract, fraud through misrepresentation, fraud through omission, conversion, breach of fiduciary duty, discrimination and accounting/restitution. For the reasons described here, a balancing of the strengths of Plaintffs' case against the value of the offer weighs heavily in favor of the settlements.

(a) **Plaintiffs' claims are uncertain.**

(i) **RICO and Fraud Claims**

Plaintiffs claim a violation of 18 U.S.C. § 1962(c), part of the RICO statute, which requires proof (i) that defendant has participated in conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity and (v) that the defendant's actions have proximately caused injury to plaintiff's business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

496, 105 S. Ct. 3275, 3285 (1985).

Defendants argue with considerable force that Plaintiffs will be unable to prove predicate acts of mail or wire fraud. Defendants note that at the time of each of the challenged transactions, the class members received a receipt that sets forth the fee paid for the exchange, the exchange rate offered by Defendants, and the number of pesos that were to be conveyed to the recipient in Mexico. Although they acknowledge that the receipt does not disclose the fact that Defendants are able to purchase pesos at a more favorable exchange rate, Defendants argue that no such disclosure is required. As in any other commercial exchange, Defendants argue, they are entitled to recover a profit on their services without disclosing the amount of that profit.

Absent a legal requirement that information be disclosed, there is ordinarily no claim for fraud based on non-disclosure of the information. *See Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill. App.3d 355, 364, 657 N.E.2d 1095, 1102 (1st Dist. 1995); *La Jolla Village Homeowners' Ass'n v. Superior Court*, 212 Cal. App. 3d 1131, 1151 (1989). According to Jim Dibe, virtually every company in the business of providing retail currency exchange services recovers at least some revenue from the FX spread. Neither Plaintiffs themselves, nor any of the Intervenors, has identified a basis in state or federal law that prohibits a money transfer provider from earning FX revenue. Professor Geoffrey Miller, a banking law expert who testified in support of the proposed settlement, explained that there is no law that requires a money transfer provider to disclose the rate at which it obtains foreign currency. Miller Testimony, Tr. 231:5-13.

19

Even if Plaintiffs could prove a fraudulent misrepresentation or omission, it is not clear that such a misrepresentation would relate to a material fact. Stanley Cardenas, formerly the head of the California Department of Banking (currently known as the Department of Financial Institutions), explained that from a customer's point of view, the material facts in a transfer of money to Mexico are (a) the amount of the service charge; (b) the exchange rate offered; and (c) the number of pesos the intended recipient will recover – all facts that Defendants fully and truthfully disclose. The fact that Defendants obtain pesos themselves at a far more favorable rate is arguably not relevant to the consumer at all. Nor is the wholesale rate paid by a retailer for any consumer product or service ordinarily disclosed to a consumer paying the retail price.

The exchange rate offered by Defendants is itself clearly disclosed on the customers' receipt, and the interbank exchange rate is published in Spanish and English language newspapers. In the only published opinion addressing a RICO and fraud claim based upon failure to disclose a foreign exchange rate margin, the district court held these circumstances defeated a showing of a specific intent to defraud. *See Companá Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 424-25 (S.D.N.Y. 1992). *See also United States v. Brown*, 79 F.3d 1550, 1559 (11th Cir. 1996) (where essential pricing information can be obtained, there is no mail fraud for failure to disclose investment potential of residential real estate or re-sale value); *Blount Fin. Servs. v. Walter E. Heller & Co.*, 819 F. 2d 151, 153 (6th Cir. 1987) (no RICO claim based upon scheme to defraud where alleged misrepresentation could have been checked against public information). Defendants argue,

further, that Plaintiffs here cannot establish justifiable reliance on Defendants' alleged failure to disclose where the true facts – i.e., the interbank exchange rates – are available. Finally, Defendants point out that Plaintiffs may well be unable to prove causation; market survey results suggest that many customers did business with Defendants for reasons of speed, reliability, security, or convenience, even though they were aware that Defendants charged more than some competitors.

To prevail under § 1962(c), Plaintiffs must prove the existence of a RICO "enterprise" that is separate from the alleged racketeering activity. Such an enterprise must be more than just a corporation, its employees, and its affiliates conducting the ordinary business of the corporation. *See Fitzgerald v. Chrysler Corp.*, 116 F. 3d 225, 226-28 (7th Cir. 1997). Defendants argue that Plaintiffs cannot prove a RICO enterprise here because all that exists is the ordinary business relationships of Defendants and other companies in the Mexican money transfer business. Indeed, deficiencies in pleading a RICO enterprise resulted in dismissal without prejudice of the RICO claims in the *Garcia*, *Ibarra*, and *Bueno* cases. Without deciding the issue, the court concludes this defense raises further uncertainty about the merits of Plaintiffs' RICO claims.

### (ii)     Breach of Contract and Conversion Claims

Plaintiffs' breach of contract and conversion claims are also vulnerable to challenge. Plaintiffs cannot assert any failure on the part of Defendants to comply with the literal terms of the agreements set forth in the receipts provided to customers at the time of their transactions. Instead, they point out that Western Union agreed to convert currency "at

Western Union's rate of exchange in effect at the time the funds are received by Western Union," an ambiguous expression that might lead customers to believe their money transfers were being made at the same favorable rate that Western Union enjoys when it purchases pesos on the interbank market. As Defendants contend, however, any such ambiguity in the general language is trumped by the more specific handwritten terms stating the number of pesos that the recipient would recover. Further, because their actions are arguably expressly authorized by the contract, Defendants cannot be guilty of conversion. Again, without deciding the issues, the court concludes Plaintiffs' contract and conversion claims are subject to strong defenses.

### (iii)   Breach of Fiduciary Duty Claim

Because commercial providers of goods and services do not generally owe fiduciary duties to their customers, Plaintiffs' claims of breach of fiduciary duty may be difficult to prove. Banks, escrow agents, and clearing brokers do not owe fiduciary obligations to their customers. *See, e.g., Carpenter v. Community Bank of Homestead*, 710 So. 2d 65, 66–67 (Fla. Dist. Ct. App. 1998)(bank); *F.G. Farah v. Mafrige & Kormanik, P.C.*, 927 S.W. 2d 663, 675-76 (Tex. App. 1996)(bank); *Bank Leumi Trust Co. v. Block 3102 Corp.*, 580 N.Y.S.2d 299, 301 (N.Y. App. Div. 1992)(bank); *Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 476 (1989)(bank); *Hannon v. Western Title Ins. Co,*, 211 Cal. App. 3d 1122, 1129 (1989) (escrow agent); *Mars v. Wedbush Morgan Sec., Inc.*, 231 Cal. App. 3d 1608, 1614-15 (1991) (clearing broker). Malcolm Lucas, former Chief Justice of the California Supreme Court, testified at the hearing in this case that, under California law, in commercial relationships governed by

specific instructions, there is no implied trust or fiduciary duty.

Defendants argue in this case that, like banks, they merely perform non-discretionary functions pursuant to contract terms, and that performance of those express terms cannot constitute a breach of fiduciary duty. The only reported decision to examine this issue has concluded that international wire transfer companies do not owe fiduciary duties to their customers. *See McDermott v. Western Union Tel. Co.*, 746 F. Supp. 1016, 1023 (E.D. Cal. 1990). The court therefore concludes that Plaintiffs' ability to prevail on their fiduciary duty claims is doubtful.

### (iv) Discrimination Claim

Plaintiffs' discrimination claims are based on the allegation that Defendants impose a greater FX spread for money transfers to Mexico than they do for transfers to other nations. Such an allegation, if proven, would support a claim of disparate impact rather than intentional discrimination. Because proof of a claim of discrimination under 42 U.S.C. § 1981 requires evidence of discriminatory intent, this claim, too, is vulnerable to a substantial defense; in fact, the district judge in the *Bueno* and *Garcia* cases dismissed discrimination claims in those complaints for this reason. *Garcia v. Western Union Fin. Servs., Inc.*, CV 97-8118 RSWL (Rcx) (C.D. Cal. Aug. 4, 1998), Ex. A in Compendium of Exhibits Submitted by Defendants, slip op. at 27-29; *Bueno v. MoneyGram Servs., Inc.*, CF 97-8117 RSWL (Rcx) (C.D. Cal. Aug. 4, 1998), Ex B in Compendium, slip op at 30-32.

### (v) Accounting and Restitution

Accounting and restitution are remedies, not independent causes of action. *See*

*Nepomoceno v. Knights of Columbus*, No. Civ. A 96 C 4789, 1999 WL 66570, at \*16 (N.D. Ill. Feb. 8, 1999), citing *First Commodity Traders, Inc. v. Heingold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985); *MRI Broadway Rental, Inc. v. United States Mineral Prods. Co.*, 662 N.Y.S.2d 114, 117 (N.Y. App. Div. 1997); *Ghirardo v. Antonioli*,, 14 Cal. 4th 39, 51 (1996).

For the reasons explained here, the court concludes that victory is far from certain with respect to any of the claims asserted by Plaintiffs here or in the related lawsuits. Moreover, in light of individual issues relating to individual class members' knowledge of the FX spread and reliance on the alleged fraudulent statements, certification of a class for litigation purposes is also uncertain. Class Counsel performed extensive research into the laws of Illinois, Texas, and California, as well as many other states. Apart from the California state law claims, addresssed below, there was no evidence that claims not asserted in this case, but available under any individual state's laws, would be more viable or provide for more substantial recovery.

### (b) Proposed settlement offers substantial value to class members.

Weighed against these considerations, the settlement proposals provide a substantial and immediate benefit to class members. In support of their petition for approval, the settlement proponents called Professor L. Manuel García y Griego and Professor Geoffrey P. Miller. Professor García y Griego is a nationally recognized expert on Mexican migration to the United States and the practices of Mexican nationals with respect to remittances to their home country. Professor Miller is Professor of Law at New York University Law School with particular expertise in banking law and regulation and class action litigation.

24

Professor Miller is also a nationally recognized expert on coupon settlements. In addition, the court considered the declarations submitted by Dr. Carlos Arce, founder and President of NuStats International, a research and consulting firm that specializes in research relating to the Hispanic community, and Professor Michael Kamins, an expert on consumer behavior and advertising.

As noted above, the proposed settlements impose a five year injunction requiring Defendants: to notify their customers about the existence of the FX spread; to provide $375 million in discount coupons for use in future Mexico money transfers and a $4.6 million *cy pres* fund, and impose on Defendants the costs and expenses of notifying the class and administering the settlements, as well as Plaintiffs' attorneys fees and costs. The agreed order will direct Defendants to disclose the fact that there is a difference in the exchange rate paid by customers and the rate paid by Defendants themselves, and that Defendants retain this difference as revenue. It will also direct Defendants to disclose the FX rate in connection with any price-related advertising, including any advertising that quotes a service charge. Such an order will end the practices that gave rise to the claims asserted in these cases and the related litigation and will eliminate any potential claim of deception or confusion. The toll-free number will enable customers to "price shop" from their homes. Because the three companies involved in these settlements constitute a large percentage of the market, they will likely impose these standards on the industry as a whole.

The consideration to be paid by Defendants is substantial. Out of pocket, Defendants must pay more that $20 million to cover the costs of notice and administration and to fund

the *cy pres* fund. According to a survey conducted by Dr. Carlos Arce, self-report suggests a large majority of class members (76%) would complete a claim form to obtain coupons and a still larger proportion (90%) would use them. Dr. Garcia y Griego's testimony concerning the nature of the Mexican migrant community and its pattern of use of electronic money transfer confirms the survey results; he testified that he believed it "would be extremely unlikely if the coupons went unused." Tr. 505:15-16.

The court recognizes that self-report concerning coupon use is subject to question. Defendants' experts, Professors Miller and Kamins, testified that a more likely coupon redemption rate is lower – according to Miller's empirical analysis, "at least 20-30%" of the class members and according to Kamins, "greater than 25%." The testimony of the objectors' expert, Texas consumer law advocate Stephen Gardner, that the redemption rate would in fact be much lower, was not based on any empirical work and was less credible. Even with a projected redemption rate of 25%, the coupon program will have a cash value to the class members of $93.75 million (25% of $375 million). Defendants will, of course, bear the risk that the actual coupon redemption rate may be substantially higher.

The court recognizes the concern that a coupon-based settlement benefits class members only to the extent they are willing to do repeat business with the alleged wrongdoers. Here that concern is ameliorated in part by the evidence that most class members engage in money transfer transactions relatively frequently and that these Defendants account for the vast majority of the market. Further, courts in numerous cases have recognized that coupon settlements can provide effective relief for class members. *See*

*Cusack v. Bank United of Texas FSB*, 159 F.3d 1040, 1041 (7th Cir. 1998) (discount certificates for credits against mortgage closing costs); *Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F. Supp. 2d 942, 959-61 (E. D. Tex. 2000) (approving settlement in which class members received "Toshiba Bucks" good only for the purchase of Toshiba products); *State of New York & Maryland v. Nintendo of Am.*, 775 F. Supp. 676, 682 (S.D.N.Y. 1991) (distribution of $5 coupons approved as settlement of nationwide antitrust class action); *In re Cuisinart Food Processor Antitrust Litig.*, M.D.L. 447, 1983 WL 153, at *8 (D. Conn. Oct. 24, 1983) (approving settlement that provided for coupon discounts on Cuisinart products); *Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F. Supp. 1 (N.D. Ohio 1982) (approving settlement of class action where relief consisted of $20 million in $1.00 coupons). *See generally* Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 Law & Contemp. Probs. 97 (1997).

As Professor Miller explained to this court, a well-designed coupon settlement can provide class members with more value than a cash settlement because the defendant is likely to be much more generous in its coupon offer: "Coupon settlements can be thought of as conserving the difference between wholesale and retail prices and passing this benefit on to the litigating parties." Miller Decl. ¶ 32. Professor Miller noted, further, that coupons may "maintain or enhance existing customer relationships," a benefit that defendant may be willing to share with class members. Miller Testimony, Tr. 256:11-21; 257:22-25. In this case, Defendants refused to offer any amount for a cash settlement that would have resulted in recovery of even as much as $1.00 per class member, an amount far too small to justify

issuance of the checks.

For several reasons, the court concludes that the coupon settlement proposed in this case is well-designed and effective. First, Defendants insisted that any cash payments would be made only after individual proof of identity and damages, a reasonable requirement because the court would likely have required such proof following a trial. Because many class members work for low wages and/or lack lawful immigration status, a requirement of individual prove-ups would likely have discouraged the participation of undocumented workers. No such individual proof will be required for class members to recover coupons. Second, based upon the average FX spread on the challenged transactions of $25, the coupons represent a recovery of 24 to 34%. It is reasonable to assume that class members, who have used Defendants' transfer services before, will have need for such services in the future, and will have little difficulty finding an agent location from among the large network of Defendants' agents throughout the country. The coupons themselves are freely transferable and can be used at par value by any bearer. Professor García y Griego believes such transfers are likely to occur among the extensive Mexican migrant community, and Professor Miller believes it is possible that a secondary market for such coupons will develop. The coupons will be available for immediate use and will remain valid for 35 months. They may be used in addition to any other discount or promotion, a provision Plaintiffs' counsel requested to minimize the possibility that such coupons become no more than a marketing tool for Defendants. Finally, the size of the coupons, which provide discounts of as much as 50% off the average transfer fee, encourages their retention and use by class members.

2. **Complexity, length, and expense of further litigation:** A second factor to be considered by the court is the complexity, length, and expense of litigation that will be spared by the proposed settlement. The court finds this factor significant. Defendants are highly motivated to defend these cases vigorously. Further litigation would undoubtedly require additional written discovery and depositions, including expert discovery. Unless the cases were promptly dismissed with prejudice on motions, further motion practice related to class certification, discovery, and summary judgment is inevitable. Proof of individual damages would be lengthy and cumbersome. Appellate practice is most likely. Here, as in *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996), continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time.

3. **Collusion between the parties:** The California Objectors have expressed concerns about the timing of the filing of these cases and Defendants' failure to move to dismiss them. (Intervenors' Proposed Findings of Fact and Conclusions of Law, at 29 ¶ 39.) The court does not find these circumstances suspicious, where Defendants had won motions to dismiss in other cases and were urged by Judge Williams to negotiate a settlement here. There is no evidence of any collusion between counsel for Plaintiffs and Defendants. To the contrary, negotiation of the settlements involved here took more than a year and were, in the words of counsel, "intense, vigorous, and at arm's length." (Proposed Findings of Fact and Conclusions of Law, at 70.) From time to time, both sides threatened to terminate negotiations before agreement was ultimately achieved. To eliminate any potential conflict of interest, the parties did not engage in fee negotiation until after the settlement of Plaintiffs'

29

claims on their merits.

4. **Opinion of competent counsel:** This fourth factor weighs heavily in favor of the proposed settlement. National Class Counsel have appeared successfully in many class actions, including some matters before this court. The court knows of no basis for the suggestion that Plaintiffs' counsel are unable or unwilling to proceed to trial in this (or any other complex) case, and no such suggestion has been made here. All counsel have represented to this court that the negotiation process was difficult, contentious, and protracted and that, in their opinions, the proposed settlements are fair, reasonable, and adequate. Indeed, the attorney who now represents objecting parties himself participated in some of the settlement discussions, made at least one important suggestion that was adopted by the parties, and appears initially to have concurred with the fairness and reasonableness of the proposed deal. The court places significant weight on the unanimously strong endorsement of these settlements by Plaintiffs' well-respected attorneys. *See Isby*, 75 F.3d at 1200; *Williams v. Gen. Elec. Capital Auto Lease,* No. 94 C 7410, 1995 WL 765266, at *10 (N.D. Ill. Dec. 26, 1995) (noting competence and professional responsibility of counsel in approving proposed settlement).

5. **Reaction of class members:** Although it is not possible to estimate the class size precisely, a conservative estimate suggests that there are between two and five million class members, many of whom have engaged in multiple transfer transactions, sometimes using names or variations of names that differ slightly. Defendants served first-class mail notice to more than 13.6 million unique names and addresses in their computerized

transaction records. A significant portion (43%) of the notices were returned undeliverable (Tr. 515), perhaps a function of the mobility of the class and variations in the spellings of names. In addition to mail notice, as described earlier, notice was provided via television, radio, and newspaper advertising in the United States and Mexico, as well as by posting in agents' offices.

In response to this notice, only 25 objections to the settlements have been submitted in both actions combined. An additional 42 persons objected by way of correspondence to counsel or to the settlement administrator, a procedure which did not technically comply with the court's directions regarding objections.[1] Another 2,772 individuals opted out of the two cases; of these opt-outs, nearly 90% were the product of a campaign organized by Mr. Kumetz, the attorney for the objectors, and Mr. Lopez, president of an organization opposed to the settlements. The court has some skepticism about the significance of these opt-outs because Mr. Kumetz initially supported the agreements and Mr. Lopez offered to do so in exchange for a guarantee of *cy pres* funds. Nevertheless, 99.9% of class members have neither opted out nor filed objections to the proposed settlements. This acceptance rate is strong circumstantial evidence in favor of the settlements. *See In re Prudential Ins. Co. of Am. Sales*

---

[1] Nativo Lopez, Co-Director of the Hermandad Mexican Nacional organization, testified that the members of his organization are universally opposed to the settlements, but the court accords this testimony little weight for two reasons. First, Mr. Lopez himself offered to support the settlements in return for a guarantee that his own organization would receive a share of the *cy pres* funds. Second, it was Mr. Lopez, who by then had become an opponent of the settlements, who explained these terms to the Hermandad members in a fashion the court cannot be assured was neutral.

*Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998); *In re Domestic Air Antitrust Litig.*, 148 F.R.D. 297, 326 n. 33 (N.D. Ga. 1993); *In re Prudential-Bache Energy Income P'ships Sec. Litig.*, 815 F. Supp. 177, 182 (E. D. La. 1993). The court notes, further, the approval of these settlements by dozens of community organizations, community leaders, and elected officials. *See* Amicus Curiae Brief of National and Local Hispanic Organizations, Elected Public Officials, and Community Leadership, filed Nov. 22, 1999 (Doc. No. 104).

The court has received substantial written correspondence from California-based community organizations and from California elected officials opposing the proposed settlements, and is sensitive to the genuine concerns expressed by these individuals and groups. Indeed, before hearing the evidence at the fairness hearing in these cases, the court shared at least some of those concerns, including a concern that a coupon-based settlement offered no real compensation to class members and might even constitute a marketing device for Defendants. For the reasons set forth here, the evidence presented at the hearing has satisfied the court that the coupon-based settlements proposed in these cases are fair and reasonable under the circumstances presented here. Furthermore, given the challenges Plaintiffs face in proving their claims, the court believes the more significant component of the relief accorded by the settlements is the agreed injunctive order. In any event, the reaction of persons who are not themselves members of the class must not influence the court in its determination on the issues of fairness, reasonableness, and adequacy of a class action settlement. Nor is the court called upon to determine whether the proposed settlements are the best deals that could have been negotiated.

The court concludes that the reaction of class members to the proposed settlements is overwhelmingly positive.

6. **Stage of proceedings:** As explained in the declaration filed by National Class Counsel, their research and analysis of the claims in these cases began months before complaints were filed. Their efforts included interviews of hundreds of class members, as well as former agents and employees of Defendants. Plaintiffs' counsel considered a number of different forums for this litigation, and analyzed the strengths and weaknesses of available claims under federal law and the law of most of the 50 states, including California. National Class Counsel Declaration, ¶ 4. Counsel in Illinois and Texas performed substantial investigation and discovery, including review of 86,000 documents which consisted, *inter alia*, of financial and transactional records, business operations documents, market surveys, and advertising materials. In addition, counsel prepared and analyzed answers to extensive written interrogatories on the number of transactions at issue, the amounts of money sent, and the manner and method for setting exchange rates. Counsel also consulted experts and published materials concerning money transfers to Mexico. *Id.* ¶¶ 4, 14, 18. A settlement was reached more than one year later. Before finalizing the agreements, National Class Counsel took Rule 30(b)(6) depositions of Defendants' key employees and depositions of finance, information services, and customer service personnel to confirm information provided by Defendants in the settlement negotiations.

The court concludes that National Class Counsel had ample opportunity to reach an informed judgment concerning the merits of the proposed settlements.

F.    **Analysis of Objections to the Settlements**

The court has carefully considered the 67 objections filed, as well as the objections voiced by seven individuals who appeared at the December 10, 1999 hearing. In addition to class members, the court has considered concerns expressed by attorneys, community leaders, and elected officials.

### 1.    Merits of Claims under California State Law

Objectors represented here by Fred Kumetz, and others ("California Objectors"), have argued that the settlements in these cases are not fair to California class members because they will result in a release of stronger claims available to such persons under California state law. The California Attorney General, two California State Senators, and a number of other California legislators have submitted briefs or letters in support of this argument. The court has considered this correspondence carefully and devoted substantial attention at the hearing to the merits and strengths of proposed California state law claims. For the reasons described here, the court is not persuaded that California state law issues militate against approval of the settlements here.

### (a)    California Financial Code

The California Financial Code establishes a comprehensive regulatory scheme governing the business of international money transmitters operating in California. Stanley Cardenas, former Chief Deputy Superintendent and Acting Superintendent of Banks in California, explained that enforcement of the Code is entrusted to the California Department of Financial Institutions (f/k/a State Banking Department), under the supervision of the

Commissioner of Financial Institutions (f/k/a California Superintendent of Banks). Violations of the Financial Code may result in an order suspending or revoking the company's license, a cease and desist order, or an action for a civil penalty; in addition, violations may be prosecuted as felonies by state or local law enforcement agencies. *See* Cal. Fin. Code §§ 1800-1827; Cardenas Decl. ¶ 27; Cardenas Testimony, Tr. 650:25-651:10. According to the statement of legislative intent and findings, the California Legislature adopted relevant provisions of the Code in 1989 for the stated purpose of protecting consumers from the "unscrupulous practices" of money transfer companies who took money from customers but never transmitted it. Cal. Fin. Code § 1800(a),(b); Cardenas Decl. ¶ 6. The provisions make no reference to any concern about rates of exchange offered by legitimate money transmitters.[2]

---

[2]     In a letter dated August 25, 2000, well after the conclusion of the fairness hearing in this case, California State Senator Richard Polanco urged this court to exclude California residents from the settlements of these cases. (Letter of Richard Polanco, Ex. A to California Intervenors' Motion to Supplement the Record.) Senator Polanco characterized the FX spread as a "fee or commission" within the meaning of the California Financial Code. A recent decision of our Court of Appeals suggests such a letter is entitled to little consideration by this court. *See Lindbland v. U.S. Wrestling Assoc., Inc.*, 227 F. 3d 1000, 1008 (7th Cir. 2000). Although the court respects Senator Polanco's concerns, it disagrees with his interpretation of the statute, for reasons explained here. In any event, Senator Polanco's own views on the issue appear to have fluctuated. According to Matthew J. Piers, Senator Polanco initially approved of these proposed settlements and, at two meetings, acknowledged that undisclosed FX revenue is not a "commission or fee" within the meaning of § 1815 and that the failure of Defendants to disclose such revenue was not addressed in the California Financial Code. He told Mr. Piers at a September 1, 1999 meeting that he was aware that Defendants' practices, while objectionable, are not illegal under California law. He explained, further, that the concern that generated these California provisions related to "fly by night operators" who take customer funds and then disappear without transmitting them.

(continued...)

### (i)    Section 1815

Section 1815(a) requires that, at the time of each transaction, the customer must be furnished with a receipt setting forth the rate of exchange, the amount of commission or fees, the net exchange after deduction of fees and commissions, the total amount of currency presented by the customer, and the amount to be delivered to the intended recipient. Objectors to the settlement have argued that the FX spread constitutes a "commission" or "fee" whose disclosure is required by this statute. The court does not agree that such a claim is one that is likely to afford California class members relief for several reasons..

First, in California as in many jurisdictions, the violation of a comprehensive regulatory scheme ordinarily does not give rise to a private right of action. *See Arriaga v. Loma Linda Univ.*, 10 Cal. App. 4th 1556, 1563-64 (1992); *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal. 3d 287 (1988). Former California Chief Justice Malcolm Lucas, who authored the *Moradi-Shalal* opinion, explained that if the legislature had intended to create civil liability for such a violation, it could have done so in clear terms. *Moradi-Shalal*, 46 Cal. 3d at 295. A comprehensive regulatory enforcement scheme is ordinarily inconsistent with enforcement by private causes of action. *Id.* at 30; *Arriaga*, 10 Cal. App. 4th at 1563-64; *Crusader Ins. Co. v. Scottsdale Ins. Co.*, 54 Cal. App. 4th 121, 131-34 (1997). Notably, the California Legislature did create a private right of action for a violation of a different provision in the same Code,

---

²(...continued)
(Declaration of Matthew J. Piers in Response to Letter From Senator Polanco, Aug. 29, 2000.)

a strong indication that the absence of such a right of action for alleged violations of other provisions was intentional. *Moncharsh v. Heily & Blase*, 3 Cal. 4th 1, 26 (1992); *cf. Touche Ross & Co. v. Reddington*, 442 U.S. 560, 571-72, 99 S. Ct. 2479, 2486-87 (1979) (no implied right of action for damages under § 17(a) of the Securities Act of 1934, where other sections of the Act expressly provide for such rights). In the *Amorsolo* case, a California state judge recently dismissed claims against Defendants under these provisions for the precise reason that there is no private right of action to enforce them. *Amorsolo v. Western Union Fin. Servs., Inc.*, No. BC 222 974 (Cal. Super. Ct. Oct. 23, 2000), slip op. at 7, Ex. C to Corrected Version of Plaintiffs' Submission of Recently Issuesd Additional Authority.

For other reasons, it seems unlikely that a claim under § 1815 would prevail. First, the Code draws a distinction between "commission or fees" and the "rate of exchange," suggesting that the disclosure requirements with respect to the former will not apply to the latter. Further, while California banking officials have been aware for years that money transmitters purchase foreign currency at one rate but offer their customers a less favorable higher rate, *see* Cardenas Decl. ¶¶ 30-31, Cardenas Testimony, Tr. 659:8-664:19, they have never interpreted the statute so as to require disclosures of the exchange rate spread to customers. Finally, the Department's interpretation of the statute is entitled to considerable deference. *See Henning v. Industrial Welfare Comm'n*, 46 Cal. 3d 1262, 1269 (1988); Lucas Decl. ¶¶ 5, 28, Lucas Testimony, Tr. 380:5-21; 393:8-12. An August 13, 1999 letter presented to this court by the California Objectors themselves, written by Senior Counsel Thomas M. Loughran for the Acting Commissioner of Financial Institutions Jan Lynn Owen, confirmed

the conclusion that the exchange rate is not to be understood as a commission or fee. *See* August 13, 1999 Letter, Ex. A to California Intervenors' Motion for Leave to Submit Newly Discovered Evidence. ("We do not ordinarily consider a gain to a licensee on an exchange transaction to constitute a fee or charge.") Mr. Loughran acknowledged the hypothetical possibility that a money transmitter might recover a very large – 36% – foreign exchange revenue, and recognized that it "might be contended that the rate differential was a de facto fee" that must be disclosed. Nevertheless, Mr. Loughran concluded that the Department could express no opinion on whether such a contention would be successful in the courts.

Notably, § 1815 makes explicit requirements for disclosure of terms necessary for a customer to understand the financial aspects of a money transfer, including the rate of exchange, the service charge, and the number of pesos the recipient will recover. The rate at which the money transmitter itself purchases pesos is arguably not relevant to the customer and is not mentioned in § 1815. Professor James R. McCall, the California Objectors' expert witness, acknowledged that a consumer would have little reason to be concerned about the wholesale rate at which the money transmitter is able to purchase pesos. Tr. 927-29.

The court concludes any claim under this section is a weak one.

### (ii) Section 1810

Section 1810(a) of the Code requires every money transmitter to furnish "equivalent funds to the person designated by the customer within 10 days after receiving that money" from the customer. The California Objectors have urged that this language requires money transmitters to provide customers with pesos at the same rate of exchange that money

transmitters themselves enjoy on the wholesale market. Again, however, any private right of action under this section is unlikely. Further, the California Legislature's failure to expressly prohibit the collection of revenue from FX spreads provides a powerful argument that the Legislature did not intend to do so. As noted earlier, Department officials have been aware of the practices of money transmitters for many years, but have never interpreted § 1810(a) as a prohibition against such practices. As Jim Dibe explained, it would be impracticable for money transmitters to carry out their money exchange practices in the fashion that California Objectors urge is required. Dibe Decl. ¶ 24. Money transmitters purchase currency in bulk without regard to the specific date or rate for each retail transaction, in some instances purchasing pesos after the retail transaction is already complete. Because the wholesale rate fluctuates frequently, it would not be possible to advise customers of the precise exchange rate at the time of the transaction, if that rate must be equal to the rate paid by the transmitter itself. *Id.* ¶ 27. The California Objectors' own expert witness himself acknowledged that § 1810 does not prohibit the practices of Defendants, nor require them to offer their own wholesale exchange rate to their retail customers. *See* McCall Testimony, Tr. 899:15-16; 879:24-871:6; 891:21-899:6; 897:2-3. The court concludes that any claim under § 1810 is a weak one.

### (iii)  Section 1810.5

Section 1810.5 of the California Financial Code requires a money transmitter to issue a refund to the customer unless the funds are forwarded within 10 days, or the customer instructs the transmitter to make the funds transfer later. There is a private right of action

for enforcement of this provision. Available remedies include return of moneys received by the money transmitter, a penalty not to exceed $1,000, and attorneys' fees and costs. The California Objectors argue that Defendants have violated this section of the Code, and that the availability of a $1,000 penalty per transaction could generate a huge damages award to California claimants. Again, the court is unpersuaded. First, as in § 1810, the fairest interpretation of the term "equivalent" is that it requires that customer funds must be converted at the retail rate of exchange offered by the money transmitter and disclosed on the receipt.

Nor are the Objectors correct that violations of this provision would generate an automatic award of $1,000 per transaction; the statutory language reflects that such an award is the *maximum* to be awarded with respect to any violation, not a guaranteed amount per transaction. The court believes that a penalty equal to 40 times the average FX revenue per transaction is most unlikely. At a minimum, the court believes such an outcome is not so likely that the settlements proposed in these cases ought not be approved, particularly where, as here, California claimants might actually be liable for Defendants' attorneys' fees were they to bring an unsuccessful claim under this section.

Notably, the attorneys who represent the California Objectors have filed several complaints against Defendants, but have never asserted a claim under § 1810.5. The court concludes, again, that any claim under this section is a weak one.

### (iv)    Section 1815(b)

Under section 1815(b), money transmitters must disclose rates of exchange in any

window or exterior signs "concerning" those rates, and must clearly state rates of exchange on interior signs and all advertising, "if rates are quoted." The California Objectors argue that because Defendants advertise their service charges ("$300 to Mexico for $12"), Defendants are required by this section also to disclose the currency exchange rate. For the reasons discussed above, the court believes there is no private right of action to enforce this provision. In any case, the language of this section directs the nature of the disclosures that must be made if an advertisement or sign concerns a rate of exchange, and appears to have no application where the sign or advertisement does not quote or concern a rate of exchange. Nor have Department officials ever interpreted the disclosure requirements to apply when the advertisement does not quote a rate of exchange. Cardenas Decl. ¶ 18.

The court concludes that any claim under § 1815(b) is a weak one.

     (v)    **Section 1816**

This section characterizes "all funds, less fees, received by" a money transmitter as "trust funds." The California Objectors believe this language creates a fiduciary duty claim available to California class members. As noted earlier, however, California law imposes no fiduciary obligations on commercial providers of goods or services. *See McDermott v. Western Union Tel. Co.,* 746 F. Supp. 1016, 1023 (E.D. Cal. 1990). Nor have Department officials interpreted § 1816 as prohibiting money transmitters from collecting FX spread revenue. As Stanley Cardenas explained, the Department instead has interpreted this language as authorizing Department officials to segregate funds received from customers in circumstances when the Department seizes the assets of a money transmitter, and protect those funds from

the claims of general creditors. Without deciding the issue, the court concludes that claims relating to the "trust fund" language of § 1816 are not so strong that the proposed settlements are unfair to California residents.

### (b) California Business and Professions Code

The California Objectors argue that California class members have an additional right of action under the California Business and Professions Code Section 17200 *et seq.* (the "Unfair Competition Law" or "UCL"). That legislation permits a private party to bring a claim for certain unfair, unlawful, or fraudulent business practices. To the extent that the Objectors argue that Defendants' practices are unlawful because they violate the California Financial Code, however, the court rejects this argument for the reasons set forth above.

The Objectors' further argument that, even if not unlawful under the Financial Code, Defendants' practices are "unfair," is not persuasive. Defendants are engaged in business for a profit. Their failure to disclose their own costs or profit margins is not, on its face, unfair. The fact that California's comprehensive regulation of Defendants' practices does not label the challenged practices unfair is a further defense to any such claim:

> Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a "safe harbor," plaintiffs may not use the general unfair competition law to assault that harbor.

*Cel-Tech Communications v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999). Defendants' argument that their compliance with provisions of the California Financial Code

constitutes a "safe harbor" is one that Plaintiffs would have to rebut in order to prevail on their UCL claim. If they were able to do so, the court notes that the only remedies available in such an action would be injunctive relief and restitution. *See* Cal. Bus. & Prof. Code § 17203. Compensatory damages, treble damages, punitive damages, and civil penalties arguably available pursuant to other theories (for example, under RICO or fraud theories asserted in these lawsuits) are not provided by UCL. *Cel-Tech*, 20 Cal. 4th at 179; *Consumers Union of United States v. Fisher Dev., Inc.*, 208 Cal. App. 3d 1433, 1443 (1989); Lucas Decl. ¶¶ 40-42.

(c)    **California Civil Code Sections 1770** *et seq.*

The California Objectors note the California Consumers Legal Remedies Act as yet another source of rights and remedies available to class members. Their theory is that Defendants' advertisement misleadingly suggests that the flat service charge is the only revenue they derive from money transfers, and by so doing constitutes "[a]dvertising goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9). Failure of a commercial supplier of goods or services to disclose its internal costs is not ordinarily deemed false advertising. Nevertheless, in this court's view, a claim of false advertising has more traction than any of the other California state law claims invoked by the Intervenors. Indeed, the California state court denied Defendants' motion to dismiss such a claim in the *Amorsolo* case. *Amorsolo v. Western Union Fin. Servs., Inc.*, No. BC 222 974 (Cal. Super. Ct. Oct. 23, 2000), slip op. at 14. As that court recognized, however, a central defense to such a claim is the argument that the alleged misrepresentation does not relate to material facts; but

43

materiality is generally a question of fact, not an issue that will permit the court to dispose of a claim on a motion. This court suspects that individual plaintiffs or representatives of a class might face difficulty in proving their allegation that "they would have researched whehter the rate of exchange offered by defendants was the actual exchange rate to defendants and the best or the market rate of exchange and would not have entered into the subject transactions if they had known that they would be charged more than a purported flat fee." *Id.* at 14-15. Such an allegation might be particularly difficult to prove if it is true, as Mr. Dibe asserted, that virtually every company in the business of providing retail currency exchange services recovers at least some revenue from the FX spread. The California Objectors' suggestion that § 1781(c) somehow insulates claims under this section from a summary judgment analysis is unpersuasive; California courts have concluded that § 1781(c)(3), like summary judgment, "provides a means of resolving CLRA actions prior to trial." *Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 612, 624 (1996).

On balance, the court concludes this claim, too, is not so strong as to require the conclusion that the proposed settlements are unfair or inadequate with respect to California residents.

(d)    California Civil Code Section 51 (Unruh Act)

Finally, the California Objectors have invoked the Unruh Act, which prohibits discrimination against consumers. *See Music Acceptance Corp. v. Lofing*, 32 Cal. App. 4th 610, 626 (1995). As is the case with the claims brought by the Plaintiffs here, such claims would face the defense that disparate impact claims are not cognizable under this statute. *See Harris*

*v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1174, n.2 (1991); Lucas Decl. ¶ 46. Indeed, in *Amorsolo*, the court dismissed claims under the Unruh Act for this reason. *Amorsolo*, slip op. at 9.

### 2. Objections to the Form and Amount of Compensation

Sixty-one class members have also objected to the nature and amount of consideration to be provided in this settlement. Not surprisingly, many expressed their preference for recovery of cash rather than coupons. As noted earlier, however, it is not this court's responsibility to determine what agreement would be optimal or most desirable to class members, but rather to determine whether the settlement proposed is fair, reasonable and adequate.

For the reasons discussed above, the court here has concluded that the coupon-based nature of this settlement is fair in the circumstances presented here. The coupons provide significant value to class members because they are freely transferable, immediately available and good for 35 months in any transaction, including where Defendants are offering other sales or promotions. Because class members often engage in multiple or repeat transactions, and because there is a well-connected Mexican community of family and friends, the coupons are more likely to be redeemed than are those offered for "big ticket," one-time purchases. Because Defendants would have insisted on more stringent prove-up procedures for a cash distribution, procedures that could have discouraged undocumented immigrants, coupons arguably enhance the likelihood that class members will participate in the claims process and benefit from the coupons.

More specific objections are discussed below:

(a) **Desire for full refund:** The court is called upon here to assess a settlement proposal, not the relief that would be accorded Plaintiffs were they to win their claims following litigation. Accordingly, the court can give little weight to objectors who have asserted that they are entitled to a full refund of 100% of their alleged damages. In light of what this court concludes are strong defenses available to Defendants, the consideration they are offering is significant.

(b) **Concerns about coupon use:** Several objectors have urged that they will have no further need for Defendants' services, or that they prefer to do business with other providers of money transfer services. As the parties here point out, however, many class members are repeat users of money transfer services; according to the survey research conducted by Dr. Arce, class members engaged in an average of 13.9 money transfers annually. Arce Decl. ¶¶ 15-16. The frequency of such transfers defeats the objection that the 35-month redemption period is unreasonably short; to the extent class members are unable to use all the coupons issued to them, this will be the case only because of their comparatively high previous use of Defendants' services. The volume of such transfers is growing, having increased approximately 11% per year since 1995. Garcia y Griego Decl. ¶¶ 7-8. In some rural areas of Mexico, Defendants' services are the only available means for reliable electronic money transfers. Garcia y Griego Decl. ¶ 16. For these reasons, the court is not concerned by the fact that the coupons are designed to be redeemable only by each issuing Defendant, rather than by all Defendants or by all money transfer service providers. The court has no

46

jurisdiction over non-parties, and therefore cannot order them to honor the coupons. Nevertheless, nothing in the terms of the settlements would prohibit other companies from honoring the coupons, if business pressures or other considerations lead them to do so.

In any event, because the coupons here are freely transferable at par value, class members who have no need of the coupons may transfer them to others who do. Even if they are unable or unwilling to demand that transferees pay for the coupons, the ability to convey them to others represents a benefit to class members. Nor is the fact that a marketplace for coupons has not already been created a significant concern; such a market may well develop after the coupons are issued. Obviously, it is not possible to predict with any accuracy the likelihood or degree to which the coupons will be used. Professor García y Griego testified credibly, however, that such factors as migration patterns, repeated money transfers, economic status, social and cultural characteristics, and the history and rationale for use of Defendants' services, all militate in favor of the conclusion that class members will in fact make maximum use of the coupons. Dr. Arce's research indicated that a very high percentage of class members (90%) expected they would use the coupons and that a substantial majority were willing to complete a claim form to obtain them. Arce Decl. ¶¶ 19, 26. Professors Miller and Kamins predicted redemption rates in the range of 20 to 30%. Because it is based on a body of research and significant experience, the court found this testimony more credible than that of Mr. Gardner, the Texas consumer advocate called as an expert witness by the California Objectors.

(c) **Inadequacy for transmitter of large sums:** One class member has complained the

settlement is inadequate for class members who, like him, transmitted larger amounts of money to Mexico than the average. The parties here agreed to an average transaction amount of $250, the amount found by Professor García y Griego for the average transaction in 1998. The court concludes, however, that it is not unreasonable for the parties to have agreed to a settlement under which the number of coupons distributed is a function of the frequency of transmissions, rather than the amount of each transmission.

(d) **Coupons as marketing device:** The court shares the concerns of those class members who are fearful that the coupons will function as a "marketing gimmick" that will result in additional profits to Defendants. These concerns are ameliorated to some degree by the fact that the coupons can be used in addition to any other discount, sale, or promotion. Although no provision of the settlements prohibits Defendants from imposing price increases that will erase the benefits provided by the coupons, the court expects that market competition will discourage such increases. Consumers' ability to enforce such market forces will be enhanced by the terms of the agreed injunction, which will require Defendants to make disclosures that will permit easy price comparison. Unless Defendants have reason to expect that all or nearly all of their customers will be armed with coupons on any given day, Defendants will not readily be able to recoup the amounts represented by the coupons by raising their transaction prices.

The California Objectors are particularly critical of the fact that Defendants will, in their view, "benefit substantially from the additional wire services that they would sell with each coupon redeemed . . . includ[ing] the revenue Defendants will derive from their

continued practice of employing a foreign exchange spread, the very practice of which Plaintiffs complain." (Intervenors' Proposed Findings of Fact and Conclusions of Law, at 24 ¶ 28.) Importantly, the practice of recovering the FX spread is *not* the practice challenged in this lawsuit, nor could Plaintiffs challenge Defendants' collection of profit on the FX margin. What is challenged here is Defendants' failure to *disclose* the recovery of FX revenue, a practice that will be ended by the injunctive relief to which Defendants have agreed.

(e) **NACA Guidelines:** The court does not share the concern expressed by the California Objectors that the proposed settlements do not meet principles established by the National Association of Consumer Advocates ("NACA"), *see* Standards and Guidelines for Litigating and Settling Consumer Class Actions, reprinted in 176 F.R.D. 375, 378 (1997). These Guidelines are useful, but unofficial and have never been adopted by a court. *See* Gardner Testimony, Tr. 279:16-280:2; Miller Decl. ¶ 41. Nor do the Guidelines persuade this court that the settlements proposed here are inadequate. Mr. Gardner himself acknowledges that there is no requirement that class action settlement coupons have a cash redemption value. Gardner Testimony, Tr. 848:24-849:5. Cash-out provisions are expensive to implement, and arguably unnecessary where the coupons are freely transferable, as they are here. Miller Testimony, Tr. 280:9-282:6. Nor is there any requirement imposed in the case law that the settlement agreement include a minimum redemption level for coupons. Finally, this court disagrees with the Guidelines to the extent that they suggest that a coupon settlement may be approved only where it provides greater relief than an all-cash settlement would afford; but here, credible evidence demonstrates that Defendants would have offered

far less by way of a cash settlement (and would have imposed substantial additional barriers) than they were willing to offer in the form of coupons.

(f) **Claims procedure:** Objections to the claims procedure provided in the settlements appear to reflect a misunderstanding of the nature of the procedure. Upon approval of the settlements by this court, Defendants will send a claim form to each class member in their computer records, containing a pre-printed record of the transfers that class member made. A class member who agrees with Defendants' calculations need only sign the claim form and return it in a postage-paid envelope. A class member who believes the list of his or her transactions is incomplete may list additional transfers on the claim form and return it. This enables class members who may have used variations in the spelling of their names to obtain the correct number of coupons. Any requirement that Defendants would insist on additional documentation before furnishing the additional coupons is unlikely.

(g) **Desire for punishment:** Finally, several class members have objected to the settlements as inadequate to "punish" Defendants or to force a change in their rate margin practices. Defendants have, however, agreed that they will make additional disclosures via toll-free numbers, customer receipt forms, and price-related advertising, agreements that will effectively end the non-disclosure practices that were central to Plaintiffs' claims. As previously discussed, Plaintiffs' claims for monetary relief are subject to substantial defenses. The court is not called upon to resolve the merits of this controversy nor to make a precise determination of the parties' legal rights, *see Isby*, 75 F.3d at 1196 (quoting *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)). The California Objectors' suggestions

that Defendants are not entitled to earn any profit on the services they provide, or that the only appropriate settlement would provide Plaintiffs with a refund of the FX spread, are unrealistic. The court believes the coupon component of the proposed settlements is fair and reasonable.

### 3. Objections to the Stipulated Injunction

Several class members have objected to aspects of the agreed injunctive relief. For example, some urge that the duration of the injunction (60 months) is too short. In this court's view, however, 60 months is a period long enough to generate permanent change in Defendants' business practices and in the standards of the marketplace. In any event, the court will retain jurisdiction to extend the injunction at the request of Class Counsel for good cause shown.

Some class members assert that the injunction is insufficient because it does not mandate disclosure of the "official" rate of exchange, set such a rate, or regulate money transfer companies. The court has no power to regulate money transfer companies in any fashion other than regulations already imposed by state or federal law, and this objection is not a valid challenge to the settlements because a judgment for Plaintiffs after a trial in these cases would not justify imposition of such regulation. There is no "official" rate of exchange; it is set by international market forces, over which this court has no power.

The California Objectors argue that the injunction will somehow authorize Defendants to violate provisions of California law. The court is unpersuaded. As discussed previously, the interpretations of California statutes pressed by the California Objectors are,

in this court's view, somewhat strained. As modified by the injunctions, the court believes Defendants will in fact comply with California law. While this court has no power to authorize a violation of state law, the language of the proposed injunction does not purport to do so. To the contrary, the proposed injunction provides that in the event of a conflict between any portion of the injunctive order and state law, the state statute "shall supersede and take precedence." Nor does the injunction prohibit any state from adopting legislation that would impose additional disclosure requirements on money transfer services.

### 4. Objections to the *Cy Pres* Proposal

The Seventh Circuit and other courts have recognized that *cy pres* contributions are proper and often are part of class action settlements. Contrary to the California Objectors' contentions, approval of such a fund does not depend on its being composed of unclaimed or residual funds. *See, e.g., Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998)(approving *cy pres* contribution to legal aid foundation); *Drennan v. Van Ru Credit Corp.*, No. 96 C 5789, 1997 WL 305298, at *1 (N.D. Ill. June 2, 1997) (same); *In re Three Mile Island Litig.*, 557 F. Supp. 96, 97 (M.D. Pa. 1982) (approving settlement that provided for $20 million to claimants and $5 million to finance public health studies and evacuation planning). Particularly in cases like this, where it may well be difficult to locate class members or to ascertain their status, a *cy pres* distribution is useful. *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345 (7th Cir. 1997) (*cy pres* recovery ideal where "it is difficult or impossible to identify the persons to whom damages should be assigned or distributed."); *Simer v. Rios*, 661 F. 2d 655, 675 (7th Cir. 1981) (*cy pres* recovery useful where class members are not likely to come forward and prove their claims

or cannot be given notice of the case.")

The classes involved here include undocumented persons who may be reluctant to seek settlement benefits regardless of how simple the claims procedures are. Further, the size, geographic dispersion, and mobility of members of the settlement classes are likely to render class members impossible to locate. The *cy pres* contribution will benefit class members who may never be located by funding charitable and public interest projects that serve the Mexican and Mexican-American communities in the United States.

The California Objectors argue that the *cy pres* provisions are not "narrowly tailored," but the cases they cite are distinguishable. In *In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1254-55 (7th Cir. 1984), the funds were designated to establish an "unneeded Foundation" that would provide no benefit to class members. Here there is no argument that the organizations that would be funded by the *cy pres* contribution are unneeded or that the funds would not benefit these organizations. In *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990), the Ninth Circuit disapproved of a *cy pres* order granted as part of a judgment, not a negotiated settlement, to an entity without any track record, without any defined purpose, without an established distribution procedure and without any assurances that the plaintiff class itself would benefit. The proposed *cy pres* fund here will be administered by a board that includes representatives from leading Latino charitable groups with substantial records of service, with a clear directive that the funds be used to benefit entities whose primary purposes include service to Mexican Americans or Mexican-American causes. *See* Miller Decl. ¶ 45. The court concludes this description of the

53

recipient organizations is sufficiently specific to provide direction to the independent board charged with the responsibility of reviewing requests for funding. This objection is overruled.

Nor is the court troubled by certain class members' objection that Defendants should not dictate the use of the *cy pres* fund. Under the parties' proposal, the boards will consist of several members, only one of whom will be a representative of Defendants. Lead Counsel Matthew J. Piers and representatives from leading Latino charitable organizations will also serve as members of the boards.

The purpose of the proposed *cy pres* relief is to reach members of the class who otherwise may not benefit from the settlements. For this reason, the court overrules the objections of class members who believe it is improper to provide cash for the *cy pres* fund but not for individual class members. Given the size of the class, distribution of the total *cy pres* distribution to individuals would not significantly enhance the value of the settlement for any class member, and could have substantially increased administrative expenses. The court recognizes that this aspect of the settlements may not directly benefit all class members, but those who have objected can be expected to come forward to claim coupons and to benefit directly. The fact that non-class members may also benefit from the *cy pres* contribution does not support the conclusion that the court should disapprove this negotiated aspect of the parties' proposed deal.

### 5. Objections to the Class Notice

Six class members have objected to the form of class notice approved by Judge Williams and re-issued in June 2000 at this court's direction to certain newly identified class

members. The language of those notice forms required that class members seeking to object or to opt out should provide proof of class membership by stating "the approximate number" of transactions the individual had conducted each year. The California Objectors offered expert testimony from Mr. Gardner that the proof requirement sets "unnecessarily high burdens" on persons wishing to object or opt out. Contrary to Mr. Gardner's suspicion that class members will have to "conduct research" in order to provide the necessary information, the notice requires only that the class member provide an approximation of the number of transactions he or she has conducted. As Dr. Arce explained, 944 out of 1,114 class members surveyed by telephone were easily able to estimate the number of remittances they had sent in the previous year. This minimal reporting requirement is not burdensome and is a reasonable safeguard against manipulation of the process by non-class members. As the parties note, requiring some proof of membership is commonplace. *See, e.g., In re Prudential Ins. Co. of America Sales Practices Litig.,* No. MDL 1061, 1999 WL 496491, at *4 (D.N.J. May 6, 1999) (requiring opt outs to include insurance policy numbers; *In re Chipcom Corp.,* 1997 WL 1102329, *20 (D. Mass. June 26, 1997) (requiring number of shares purchased or sold, date of transaction, and price); *In re Conn. Gen. Life Ins. Co.,* No. MDL 1136, 1997 WL 910387, at *27 (C.D. Cal. Feb. 13, 1997) (same).

The California Objectors have suggested that the notice is inadequate because "it did not ask about how many people would respond to a cash payment offer, whether they preferred cash to coupons, or approved of the settlement." (Intervenors' Proposed Findings of Fact and Conclusions of Law, at 9 ¶ 28, citing Tr. 536-37.) The court recognizes that many

class members would indeed have preferred cash payments. The purpose of class notice is not to canvas class members regarding their preferences, however; it is to advise them of the terms of the agreement which has been reached and provide those who disapprove of those terms an opportunity to object or to opt out. The notice accomplished these purposes.

### 6.    Miscellaneous Objections

A handful of remaining objections can be addressed briefly. Some objections merely reiterated factual allegations of the complaint. One class member objected to Western Union's published transfer fees, which are not the subject of this litigation and are unaffected by the proposed settlements. Two objectors expressed a desire for better, more reliable service and "a free call." Again, these objections are unrelated to the subject matter of this litigation or to terms of the proposed settlement.

One class member objects to the certification of a class for purposes of settlement, arguing that it creates a conflict between the class and counsel. The Seventh Circuit has repeatedly approved settlements negotiated prior to class certification, however, *see, e.g., Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 681, 685 (7th Cir. 1987); *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 300 (7th Cir. 1985); *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416, 420, 430 (7th Cir. 1977). For reasons discussed above, the court finds that the settlement of these cases did not raise concerns regarding a conflict of interest between the class and counsel. The settlements were the product of lengthy and difficult negotiations, and there was no resolution of the claim for attorneys' fees for Class Counsel until an agreement had been reached with respect to the merits.

### G. Objections to Award of Attorneys' Fees

Several class members objected to the fees that will be awarded pursuant to the proposed settlements. Some suggest that, like class members, the attorneys for Plaintiffs should be limited to a coupon recovery. Even where the relief accorded is non-monetary, an award of cash for attorneys fees is appropriate. In any event, there is a substantial basis in the record for the conclusion that class members will have continued need for the use of money transfer services. No basis in the record supports such a conclusion with respect to the attorneys for the class members.

Nor is the court inclined to question the reasonableness of the amount of fees for which approval is sought. The negotiated provisions call for payment of a total of $10,428,571 in fees in these two actions subject to judicial approval. Such fees will be divided among a team of attorneys from eight law firms. As Frank J. McGarr, former Chief Judge of this court, has observed, the negotiated award in this case is well below the established 30% benchmark for an award of fees in class actions; the amount sought is significantly less than 30% of the face value of the coupons, assuming that 20 to 30% of such coupons are in fact redeemed. National Class Counsel faced extremely high risks in light of the significant defenses that could be raised to each of the claims asserted here. Because the attorneys fees award was separately negotiated and separately funded, it does not reflect any diminished recovery to class members.

The relief negotiated by attorneys for the class is significant. A class member who elects to receive coupons and redeems them can reasonably expect to recover 25% of his

average out-of-pocket losses, even using the generous calculus of $25 actual loss per transaction. This recovery was achieved in the face of long odds; while these cases were pending, Defendants won motions to dismiss RICO claims in the *Garcia*, *Bueno*, and *Ibarra* actions.

Finally, the court respectfully declines to adopt the proposal of the California Objectors that the award of fees be delayed pending a determination of the number of coupons that are actually redeemed. The court knows of no basis for any suggestion that Class Counsel compromised class claims in return for a greater fee recovery, and the California Objectors have not offered one. Although there can be no guaranteed coupon redemption rate, the court is satisfied from the evidence discussed here that the Plaintiffs' projections of a 20 to 30% redemption rate is reasonable, and is unwilling to require counsel to become guarantors of circumstances than cannot be dependably predicted by anyone.

## CONCLUSION

For the reasons described herein, the court concludes that the settlements is fair, reasonable, and adequate for the settlement class members. The settlements are approved in all respects. The court has considered the objections and overrules them for the reasons presented in this opinion. The court concludes that the parties to the proposed settlements have met their burden of showing that these settlements are fair, reasonable, adequate, negotiated at arm's length and reached in the considered judgment of attorneys fully aware of the facts and the strengths and weaknesses of the claims asserted.

The court will enter an Order and Final Judgment as provided in the settlements.

Entry of this Judgment approving the settlements ends the litigation of all claims alleged in these cases. There is no cognizable relationship between entry of judgment as a result of the final approval of these settlements and the matters as to which the court has retained jurisdiction. This Order and Final Judgment will be final and appealable; any perceived need for appellate review is not rendered moot by further developments over which the court has retained jurisdiction.

ENTER:

Dated: December 21, 2000

REBECCA R. PALLMEYER
United States District Judge